UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

JENNIFER HORACE O/B/O
J.J.J.,

                           Plaintiff                DECISION AND ORDER

-vs-

                                               13-CV-6648 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                             Defendant.
_____

APPEARANCES

For the Plaintiff:                Justin M. Goldstein, Esq.
                                 Law Offices of Kenneth Hiller, PPLC
                                 6000 North Bailey Avenue, Suite 1A
                                 Amherst, New York 14226

For the Defendant:              Michelle Lynn Christ, Esq.
                                   Social Security Administration
                                 Office of General Counsel
                                 26 Federal Plaza, Room 3904
                                 New York, New York 10278

                                 Mary C. Kane, A.U.S.A.
                                 Office of the United States Attorney
                                 for the Western District of New York
                                 138 Delaware Avenue
                                 Buffalo, New York 14202

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Jennifer Horace ("Plaintiff") for Social Security Disability

Insurance ("SSDI") and Supplemental Security Income ("SSI") disability benefits on

behalf of her minor son, J.J.J., who is diagnosed with Attention Deficit Hyperactivity

Disorder ("ADHD").   Now before the Court is Plaintiff's motion (Docket No. [#10]) for

judgment on the pleadings and Defendant's cross-motion [#15] for judgment on the

pleadings.   Plaintiff's application is granted, Defendant's application is denied, and the

matter is remanded for a new hearing.

EVIDENCE

The evidence was summarized in the parties' submissions and need not be

repeated here in its entirety.   It is sufficient to note the following facts.

<u>Medical/Psychological Evidence</u>

On February 2, 2010, Plaintiff told J.J.J.'s primary care doctor, Elizabeth Brown,

M.D. ("Brown"),  that J.J.J., who was in third grade,  was having behavioral problems at

school, including "running out of the classroom" and "throw[ing] things at other kids."

(437).   Plaintiff further indicated that J.J.J. was on "out of school suspension," because

a previous period of in-school suspension "didn't help." (437).   Brown noted that J.J.J.

was an "active child" who, during the office visit, "tore paper off the [exam] table, talked,

laid down behind the curtain [and] interrupted repeatedly." (438).

On April 6, 2010, Plaintiff told Dr. Brown that J.J.J. was doing somewhat better in

school, in that he had " few days of doing better," whereas he usually got into trouble

"every day." (433).   Brown seemed to express doubt as to J.J.J.'s diagnosis. (433)

("ADHD?").   In that regard, Brown indicated that she would try increasing Adderall, but

that if that did not help improve J.J.J.'s behavior, she would try something else, such as

Concerta, or perhaps refer J.J.J. for a psychological evaluation. (433).

On November 9, 2010, Dr. Brown indicated that J.J.J.'s ADHD "appear[ed] to be

2

stable" on Adderall, though she was concerned that he was not gaining weight. (429).

Plaintiff reported that J.J.J. had been involved in "one incident of fighting," but had

"mostly good days" that week. (429).

On January 7, 2011, non-treating consulting psychologist Lynn Lambert, Psy.D.

("Lambert") conducted a psychiatric evaluation. (306-310).  Lambert reported that J.J.J.

was eight years old and taking Adderall.  Lambert reported that J.J.J. could be angry

and defiant, but more so with his mother than with teachers. (307).  Noticeably absent

from Lambert's report, in light of the record below, is any reference to J.J.J. acting

violently toward other students or adults.  To the contrary, Lambert stated that,

according to Plaintiff, J.J.J. "ha[d] adequate peer relations in school." (308).  Plaintiff

reportedly told Lambert that J.J.J. "mostly adequately" bathed himself, but that he

needed coaching and direction to brush his teeth, and did not assist well with

household chores due to distractibility.  Upon examination, Lambert found the following:

impaired attention and concentration; mildly impaired memory skills; average cognitive

functioning; fair insight; and "fair to occasionally poor" judgment, "due to occasional

hyperactivity and excessive talking." (308).  Overall, Lambert found that J.J.J. was only

"mildly to moderately challenged" with regard to attention and concentration, "mildly

challenged" with regard to social behavior, and "mildly to moderately challenged" to

interact adequately with adults. (309).

On January 14, 2011, non-treating non-examining agency review psychologist A.

Hochberg ("Hochberg") completed a Childhood Disability Evaluation Form (311-316).

Hochberg suggests that in preparing the report, he relied on some medical records and

some school records, but had no information from J.J.J.'s teacher. (313).  Hochberg

3

stated that J.J.J. had "no limitation" in four of the six domains which will be discussed further below: acquiring and using information, moving about and manipulating objects, caring for oneself and health and physical well being.  Hochberg stated that J.J.J. had "less than marked" impairments in two domains: attending and completing tasks, and interacting and relating with others.  With regard to his opinion about the domain of "attending and completing tasks," Hochberg purportedly relied on a medical office note indicating that J.J.J. had "no problems" at school with "leaving classroom or putting hands on others." (313) (presumably referring to office note dated October 10, 2010 (431)).  With regard to the domain of "interacting and relating with others," Hochberg suggested that J.J.J.'s behavior could be bad at home, but that J.J.J. "does better at school." (313).

On March 17, 2011, Plaintiff informed Dr. Brown that J.J.J.'s current medication (Concerta)  wasn't helping as much, and that he "ha[d] gotten into trouble with the afterschool program." (359).  Plaintiff also indicated that J.J.J. was wetting the bed again. (359).

On April 19, 2011, Plaintiff told Dr. Brown that J.J.J. was having "good days and bad days" at school. (356).  Plaintiff indicated that J.J.J. seemed to be better on Adderall, and had not hit any other kids lately, but had been "mouthy" with a teacher's aide. (356).  Brown opined that it was "reasonable" to refer J.J.J. to Genesee Mental Health. (356).

On May 24, 2011, Laurel Bonney, LCSW ("Bonney"), completed a form entitled "OMH Serious Emotional Disturb" [sic]. (390).  On the form, Bonney indicated that J.J.J. had "moderate" functional problems with "social relationships," "self-direction/ self

4

control" and "learning ability." (390).

On July 25, 2011, at Genesee Mental Health Center, Bonney completed a

Psychosocial Assessment Admission Note. (317-322).  Plaintiff reportedly told Bonney

that J.J.J. was hyperactive, had difficulty following directions, frequently interrupted

people, had poor impulse control, was aggressive with his peers, lied, stole objects,

possessed matches and lighters, and wet the bed several times per month.  (317).

However, Plaintiff also reportedly told Bonney that J.J.J. was generally doing well at

school, although he had gotten in trouble for hitting other children and being disruptive.

Bonney reported that J.J.J. worked well with "one-to-one attention and close monitoring

and redirection." (320).

On August 31, 2011, at Genesee Mental Health, Nurse Practitioner Catherine

Kleckner, N.P. ("Kleckner"),  reported that J.J.J. was "impulsive," "touching all of the

toys in the office, fleetingly going from one to the next and frequently interrupted

conversation," but "does well with redirection." (331).  Kleckner opined that J.J.J.

"seems to need some close monitoring and much redirection." *Id*.  Kleckner noted that

J.J.J. had problems at school with impulsivity and aggression toward others, but that his

behavior improved with medication. (331).  Plaintiff reported that J.J.J. needed a

medication change, because his current medication (methylphenidate) was "no longer

effective," and Kleckner indicated that they would try a new medication, Concerta.[1]

(331).

On July 11, 2011, Plaintiff told Dr. Brown that the Concerta  was helping J.J.J.'s

---

[1]This statement is confusing, since the record indicates that J.J.J. was already taking Concerta in
March 2011.

behavior, though she thought that Adderall was better. (353).  Plaintiff stated, though, that she was still concerned about J.J.J.'s aggression and failure to take responsibility for his actions. (353).

On September 7, 2011, Plaintiff reportedly told Nurse Practitioner Laura Carpenter ("Carpenter") that J.J.J. was having fewer "interruptions during the day" on his new medication, and that his "ADHD/behavioral issues" were "improved." (367).

On September 26, 2011, Plaintiff told Bonney that J.J.J. was "doing well in school" in Fourth Grade, but "continue[d] to encounter daily difficulties in the areas of following directions, responding appropriately to limits and appropriate socialization with peers." (338).  Plaintiff indicated that J.J.J. received "disciplinary interventions at school." (338).  J.J.J. indicated that he enjoyed school. (338).  Plaintiff stated that she noticed "some improvement" with J.J.J.'s new medication. (338).  Part of Bonney's recommended treatment plan was that J.J.J. "refrain from hitting other kids when frustrated and/or disappointed/angry." (339).

On October 11, 2011, Plaintiff informed Kleckner that switching J.J.J. from Adderall to Concerta was "not effective," because J.J.J. had "been in trouble at school daily." (342).  Plaintiff indicated that J.J.J. had been placed in an "in-school suspension" program, and that she wanted J.J.J. put back on Adderall, because he had behaved better in school when taking that drug. (342).  Consequently, Kleckner switched J.J.J. from Concerta back to Adderall. (342).

On October 26, 2011, Plaintiff indicated that J.J.J.'s behavior had improved somewhat after being placed back on Adderall, and that he had not received any new school suspensions during the past two weeks. (344).  Further, Plaintiff indicated that

6

J.J.J. showed a significant improvement in his impulse control. (344).  However, it appears that such improvement was short-lived.

On November 11, 2011, Plaintiff informed Bonney that J.J.J. had recently received a five-day suspension for threatening another student with a knife, though J.J.J. denied that he threatened the child. (345).  Plaintiff also indicated that the school's Committee on Special Education ("CSE") was considering whether J.J.J. needed a plan for "impulsivity and difficulty regulating [his behavior] at school." (345).

On December 14, 2011, Plaintiff informed Bonney that J.J.J. had been moved to a different school, School No. 29, "due to long-term suspension," after he was found in possession of a pocket knife for the second time. (348).  Plaintiff also related an incident in which J.J.J. had shown "aggression towards [a] peer on [the school] bus." (348).  Plaintiff further indicated that J.J.J. "continue[d] to use foul language at times in response to teachers and was kicked out of [a] tutoring program due to cursing." (348).

On January 3, 2012, Kleckner examined J.J.J., at which time J.J.J. had been without medication for about a week, while on a school vacation. (349).  Kleckner reported that J.J.J. seemed immature, whiny, sad and withdrawn. (349).  Kleckner opined that J.J.J. "ha[d] not benefited from Adderall XR nor from Concerta." (349).  Kleckner reviewed alternative diagnoses, including anxiety and depression, noting that J.J.J. exhibited "symptoms of chronic irritability, anger outbursts, aggression toward peers [and] younger family members [and] poor sleep." (349).  Kleckner recommended that J.J.J. be placed on an antidepressant, Celexa, and that the ADHD "psychostimulants" be discontinued. (349).  Specifically, Kleckner discontinued Adderall, and placed J.J.J. on "Celexa to target symptoms of anxiety, irritability, anger,

outbursts, aggression and initial insomnia." (524).  Kleckner also added Clonadine to "target symptoms of hyperactivity and impulsivity." (524).

On April 24, 2012, Dr. Brown completed a medical statement for Plaintiff's attorney. (602-605).  Brown opined that J.J.J. had "no limitation" with regard to "moving about and manipulating objects" and "health and physical well-being," but that he had "moderate limitation" with regard to "acquiring and using information" and "caring for self," and "marked limitation" with regard to "attending and completing tasks" and "interacting and relating with others." (604).  Brown indicated, though, that she had last seen J.J.J. on October 24, 2011, and that since that time J.J.J. began treatment with Genesee Mental Health, which had recently changed his medications. (603).  Brown recommended that the evaluator contact Genesee Mental Health for the most up-to-date records. (605).

On May 2, 2012, LCSW Bonney completed a form report for Plaintiff's attorney. (610-612).  Bonney indicated that J.J.J. often had problems with paying attention to details, sustaining attention at work and play, listening when spoken to, following through with instructions, organizing tasks, engaging in task that require sustained mental effort, losing things, and being distracted. (611).  Bonney opined that J.J.J. had "severe" problems with inattention and hyperactivity, and "extreme" problems with impulsivity.  (611).  Bonney stated that J.J.J. had "mild" limitations in "cogntive/communicative function" and "age-appropriate personal functioning," and "marked" limitations in "age-appropriate social functioning" and "maintaining concentration." (612).  Bonney further indicated that J.J.J. was "markedly limited" with regard to social functioning. (612).

8

School Evidence

At the end of the 2008-2009 school year, when J.J.J. was finishing First Grade, his teacher observed that J.J.J.'s "behavior greatly interferes with his progress." (545). The teacher further observed that J.J.J. "needs continued reminders to think before he acts, and to treat others the way he would like to be treated.  In less structured settings, he sometimes makes poor choices and gets into conflicts with his peers." (545).  The teacher further noted that J.J.J. had "beg[un] throwing things in the classroom," and expressed the hope that such behavior would not continue in Second Grade. (545).

School records indicate that during the 2009-2010 school year, J.J.J. was disciplined on numerous occasions for infractions including the following: punching and slapping other children in the face on numerous occasions; kicking a child in the stomach; choking a child; taking off his belt and using it to whip another student; using his belt to "snap" at another child; using his coat, with a heavy object in the pocket, to whip other children; poking another child with a pencil; taking a girl's book bag and throwing it in her face "quite harsh[ly]";  stealing objects from other students and teachers; stealing from the school's "holiday store"; using obscenities toward other students and staff, including calling a teacher  "mother-f----r"; and "making verbal assaults on the teacher."

In December 2009, J.J.J. was placed in the school's Alternative to Suspension ("ATS") program. (498).  On January 4, 2010, the ATS teacher wrote that J.J.J. "needed 1:1 help" completing work, and would benefit from taking workshops in "gratitude," "respect" and "kindness." (498).

On January 6, 2010, J.J.J. was written up and given an out-of-school

suspension, after he ran out of the classroom, ran around the school building, and then hid under a staff member's desk. (499).  That same day, the Principal of School No. 28, Susan Ladd ("Ladd"), wrote a lengthy report about J.J.J., beginning with this summary:

> [J.J.J.] refuses to remain in the classroom for an entire day and completely disrupts the educational process for himself and all of his classmates.  Today he ran around the school banging on classroom doors, hiding from adults, kicking objects and causing havoc in the entire building.  He was screaming, defiant, and did not listen to his mother, the principal, the assistant principal or the school security officer.  He poses a danger to himself and others when he behaves in this manner.  It has been occurring on a daily basis for the last few months.  He has been to our Alternative to Suspension room 10 times and we have worked with his mother to try and solve the problem.  At this point interventions are not working.  [J.J.J.] has seen our school's Social Worker several times.

(500). Ladd indicated that the school had been calling J.J.J.'s mother "several times each day," but that the result was, "[n]o change in behavior, [but rather,] severe escalation." (501).

On January 15, 2010, J.J.J. used a pair of scissors to threaten another student, saying "I will stab you." (512).  That same day, a school staff member issued a request to have J.J.J. evaluated, which stated:

> [J.J.J.] is extremely hyperactive and inattentive.  In addition, he is both verbally and physically aggressive to peers and at times adults.  [J.J.J.] has intentionally provoked other by saying such things as "you are a dirty bitch" and "fucking stupid."  [J.J.J.] does not seem to learn from mistakes and is not fearful of older, bigger students.  He seems to have no remorse for his actions.  He has been in the ATS room many times with no positive results.  Academically, he is on grade level.  Contact with mother has resulted in no improvement.

(536).

On February 23, 2010, apparently in response to the aforementioned referral, James Wallace, M.D. ("Wallace"), a child and adolescent psychiatrist for the Rochester City School District, evaluated J.J.J. (537-538).  Wallace opined that J.J.J. was "a bright boy doing grade level work." (538).  Wallace reported that, according to Plaintiff, J.J.J. had been fine in school until recently, which, from the record above, would not have been accurate. (538).  Wallace conducted a mental status exam and stated, in pertinent part:

> [J.J.J.] has a very limited attention span and very quickly got bored and somewhat pouty.  He was frustrated with the fact that he was in the building and couldn't go to his class because he was still suspended.  He gets preoccupied and agitated and his is quite needy and demanding at times.  He can't handle frustration without falling apart although he does better with that when his mom is in the room.  There is no evidence of a thought disorder.  He is not suicidal or homicidal.

(538).  Wallace recommended that Plaintiff continue to work with Dr. Brown to address J.J.J.'s behavior with medication, and opined that J.J.J. would need "a more aggressive dose" of Adderall before returning to school. (538).

On September 17, 2010, School No. 28's Response to Intervention ("RTI") Committee met to discuss J.J.J.  The committee's report stated that J.J.J. could "be verbally and physically aggressive with peers, [and did] not take responsibility for his actions." (549).  The report further stated, though: "Behaviorally he appears to be more in control; he began a new medication which seems to be working so far." (549).

On December 10, 2010, J.J.J. and another student were observed fighting with a third student. (554).

On December 17, 2010, the RTI Committee reported that, "[i]n the past two

week[s], [J.J.J.'s] behavior has been regressing.  He has been sent to [Room] 215 several times plus was sent to the SHIP for having a 'metal ring in his hand and slamming it in [a staff member's] hand.'" (552).

On January 11, 2011, a school report concerning J.J.J. stated: "Disruptive all day, multiple phone calls home by multiple teachers." (556).

On January 13, 2011, a school staff member observed J.J.J. "teasing/bullying" another student and using his hand to pretend to shoot the child with a gun. (557).  That same day, when J.J.J. was apparently in an in-school-suspension environment while awaiting a hearing on his long-term suspension, he screamed at a female adult volunteer and attempted to punch her. (508).  Further, J.J.J. continued to attempt to attack the volunteer even after a staff member intervened. *Id*..  Later that same day, J.J.J. pushed, and threatened to punch, another student, and then called the student a "dumb ass." (509).

On February 4, 2011, J.J.J.'s teacher reported that J.J.J. injured another student by shoving him into a cabinet, injuring the other boy's eye. (560).

On February 9, 2011, a school staff member had to intervene when J.J.J. was attempting to punch another boy in the face. (561).

On March 3, 2011, a teacher reported that J.J.J. was sent out of the classroom for being disruptive, after which he disrupted a different  classroom and then ran into the hallway. (563).

On March 18, 2011, J.J.J. called two female staff members "stupid," and then called one of the women "the 'B' word" four times. (564).

On March 25, 2011, J.J.J. was written up for fighting with another boy. (565).

12

That same day, the RTI Committee reported that J.J.J. was frequently having to eat lunch with administrators due to his misbehavior. (570).

On April 12, 2011, J.J.J. became angry, threw crayons across the room, and threatened the teacher that she could lose her job if he told his mother that the teacher had hit him. (572).

On April 13, 2011, J.J.J. was disciplined for "hit[ting] another child in the head 2 times." (574). On May 2, 2011, J.J.J. hit another child in the face. (575). On May 16, 2011, J.J.J. "smacked" another child in the face. (576). On May 26, 2011, J.J.J. slapped another child in the face, and was placed in in-school suspension. (515).

At some point during J.J.J.'s third-grade year, 2010-2011, his teacher at School No. 28 completed a "Teacher Questionnaire" which is not signed. In this regard, it appears that there was one more page of the questionnaire, the signature page, which is not included in the record. (258). In any event, the teacher indicated that, with regard to "attending and completing tasks," J.J.J. had "a slight problem" in most areas, "an obvious problem" with regard to "focusing long enough to finish assigned activity or task" and "waiting to take turns," and a "a serious problem" with regard to "working without distracting himself or others." (256). The teacher further indicated that J.J.J. had these problems on a daily basis. (256). The teacher indicated that J.J.J. did not seem to have any problems with regard to "moving about and manipulating objects" or "physical well being." (257-258).

On September 30, 2011, at the start of the 2011-2012 school year,  J.J.J. was put in in-school suspension for "putting himself and others in serious danger." (516).

On October 6, 2011 and October 11, 2011,  J.J.J. was placed in in-school

13

suspension after "physical altercations." (517-518).

On October 28, 2011,  J.J.J. was put in in-school suspension following "an incident involving a weapon," apparently referring to a knife. (519-520).  On November 18, 2011, Ladd placed J.J.J. on out-of-school suspension after he was again found in possession of a knife. (520).  Further, when a security officer attempted to take the knife, J.J.J. "put up a struggle and kicked the security officer." (520).

On February 28, 2012, the CSE notified Plaintiff that J.J.J. was not eligible to receive special education services, because even though he had "a history of behavioral concerns," his last report card indicated that he was "currently working slightly below grade level [and was] responding to academic interventions put in place." (527).  The Court finds it odd, though, that the CSE would indicate that J.J.J. was only "slightly below grade level" when in fact he was actually working a full year or more below grade level.  Specifically, the CSE reported that J.J.J.'s math skills were fifteen months behind his current (Fourth Grade) placement (530), his reading skills were eleven months behind his current placement. (531), and his writing skills were seventeen months behind his current placement. (531).  The CSE report further stated that intelligence testing showed J.J.J. to be below average, but suggested that such result was not entirely accurate, due to his limited attention span and disruptive behaviors during testing. (530).

Although the CSE determined that J.J.J. did not need special education, it indicated that he might benefit from "a Behavior Intervention Plan in place if warranted," after further testing. (527).  With regard to J.J.J.'s behavior, the CSE report noted that he

14

> demonstrate[s] a combination of behavior symptoms that suggests him to
> be exhibiting *severe physically and emotionally impulsive behaviors*,
> verbal and physically aggressive behavior tendencies towards other
> children and adults, disruptive behavior problems such as aggression,
> hyperactivity and delinquency, a disregard for social norms and rules, odd
> behaviors within 'normal' settings and a tendency to demonstrate strong
> abnormal negative emotions and poor emotional self-control.  He was also
> found to be a risk to experience strong personal feelings of inadequacy,
> insecurity and anxiety, learning and academic delays, social avoidance
> behaviors towards other children  and adults, and emotionally odd and
> explosive behaviors.  *It should be noted that a child with this type of
> behavior profile suggests the presence of severe behavior, social and
> emotional problems that often disrupt his learning and that of his peers*.

(531) (emphasis added).  In short, it seems that the CSE determined that while J.J.J.'s

behavior was terrible, his academic performance was not bad enough to warrant

special education services.

On May 1, 2012, someone at J.J.J.'s school, School No. 28, completed a

questionnaire for Plaintiff's attorney.  The questionnaire is not signed, but that appears

to be due to the fact that the only signature line provided on the form was designated as

being for a medical doctor. (609).  However, based upon the content of the report, it

seems reasonable to assume that it was completed by J.J.J.'s teacher.  In that regard,

the form indicates that J.J.J. "often fails to pay attention to details," has difficulty

sustaining attention," "does not seem to listen when spoken to directly," "often does not

follow through on instructions," "often has difficulty organizing tasks," "often avoids . . .

tasks that require sustained mental effort," "often loses things," "is easily distracted" and

"is often forgetful." (607).  The author further indicated that J.J.J. has "extreme"

problems with "inattention," "impulsiveness" and "hyperactivity." (607).  The author

indicated that J.J.J. had "marked" difficulty with age-appropriate

cognitive/communicative function," and "extreme" difficulty with "age-appropriate social

functioning," age-appropriate personal functioning" and "maintaining concentration,

persistence or pace." (608).  The author added that J.J.J. needed "many prompts" to

attend to his work, left class without permission and was "disrespectful to adults." (609).

The author observed that J.J.J. "has [a] difficult time functioning in a general education

classroom." (609).

PROCEDURAL HISTORY

The procedural history is undisputed and adequately set forth in the parties'

briefs, and need not be repeated here.  It is sufficient to note that Plaintiff, on behalf of

J.J.J., who was nine years old at the time of the hearing before the Administrative Law

Judge ("ALJ"), maintains that J.J.J. is disabled due to ADHD.[2]  In connection with

Plaintiff's application, she submitted the aforementioned medical records and school

records to the Commissioner.  Additionally, the Commissioner had Lambert's

psychiatric evaluation of J.J.J. (306-310) and Hochberg's report. (311-316).

On May 22, 2012, the ALJ conducted a hearing, at which Plaintiff was

represented by an attorney, and at which Plaintiff, J.J.J. and a consultative medical

expert ("ME") for the Commissioner, Sreedevi Chandrasekhar, M.D. ("Chandrasekhar"),

testified. (32-69).  On July 20, 2012, the ALJ issued a Decision (74-86) finding that

J.J.J. is not disabled.  In that regard, although the ALJ found that J.J.J. was not

---

[2]Plaintiff also contends that J.J.J. is disabled due to asthma, but the ALJ found, and Plaintiff does
not now dispute, that the asthma is essentially asymptomatic and therefore not "a problem for [J.J.J.] right
now." (78).

16

engaged in substantial gainful activity and that J.J.J.'s ADHD was severe, he further found that the ADHD did not meet or medically equal, or functionally equal, the listing for ADHD.

In that regard, the ALJ purportedly applied the required three-step sequential analysis for evaluating whether a child is disabled.  That standard is as follows:

> The Commissioner follows a three-step sequential evaluation process to determine whether a child is disabled.  At step one, if a child is performing substantial gainful activity, the claim is denied.  If not, the Commissioner considers whether the child's impairment is non-severe, a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."  If the child's impairment is not severe, the claim is denied.

> If the impairment is severe, then the Commissioner considers whether the child has an impairment or a collection of impairments that "meet, medically equal, or functionally equal" any impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P (the "Listings").  If the medical findings do not meet or medically equal the criteria contained in the Listings, the Commissioner reviews the evidence to determine how the child's impairments affect h[is] functioning in several broad areas, known as domains.  These domains are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating to others; (iv) moving and manipulating objects; (v) caring for one's self; and (vi) health and physical well-being.  The regulations provide for each age category, and establish a different standard for each age group.

> The Commissioner determines within each domain whether the degree of the child's limitation is "marked" or "extreme."  A child is considered disabled if [he] has an extreme limitation in one domain or a marked limitation in two domains.  A "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  An "extreme" limitation is one that "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."

*Arsenault v. Colvin*, No. 13–cv–6589 (SAS), 2015 WL 631403 at *6 (S.D.N.Y. Feb. 13, 2015) (citations and footnotes omitted); *see also*, 20 CFR § 416.924.

At the first two steps of this sequential analysis, the ALJ found that J.J.J. was not engaging in substantial gainful activity and that J.J.J.'s ADHD was severe.  At the third step of the analysis, the ALJ found that J.J.J.'s ADHD did not meet or medically equal the listing (Listing 112.11) for ADHD.  Further, the ALJ found that J.J.J.'s ADHD did not functionally equal the severity of the listing.  Essentially, the ALJ concluded that while J.J.J.'s ADHD was particularly bad in 2010, it subsequently improved, in 2011 and 2012, in response to new medication.

However, in making that determination, the ALJ effectively disregarded various evidence indicating that J.J.J.'s condition had not actually improved at all.  For example, the ALJ gave no weight to Bonney's report, because she was an LCSW. (79).  The ALJ similarly gave only "little weight" to another such report from Bonney, even though it was co-signed by supervising psychiatrist Temitope Oyegbile, M.D. ("Oyegbile"), and gave "no weight" to an evaluation by a teacher who observed J.J.J. on a daily basis. (79).  Similarly, the ALJ gave "little weight" to a report from J.J.J.'s primary treating physician, Dr. Brown, indicating that J.J.J. had marked limitations in two domains, since, in the ALJ's view, J.J.J. had shown improvement since he was last examined by Brown. (80).

On the other hand, the ALJ gave "significant weight" (80) to the report of Lambert, who examined J.J.J. on one occasion.  The ALJ also gave "significant weight"[3]

---

[3]The ALJ repeatedly referenced the testimony of the ME, Dr. Chandrasekhar, in making findings at the third step of the sequential analysis. *See, e.g.*, (81-84, 86).

(86) to the testimony of the ME, Dr. Chandrasekhar, who testified at the hearing, even though Chandrasekhar never met J.J.J. and never saw some of Plaintiff's evidence submitted at the hearing. *See*, ALJ's Decision (80) ("Dr. Chandrasekhar was able to review *the majority of* the record.") (emphasis added).  Similarly, the ALJ repeatedly relied on the report of non-treating non-examining agency psychologist Hochberg in making findings at the third step of the sequential analysis, even though he claimed to have given it only "some weight" (86), and even though Hochberg's opinion was based upon an incomplete record. *See, e.g.*, (81-84, 86). In fact, when the ALJ discussed the six domains referenced above, the only opinions he mentioned were those of Chandrasekhar and Hochberg, neither of whom ever examined Plaintiff. (81-86).

On December 9, 2013, Plaintiff commenced this action.  On April 25, 2014, Plaintiff filed her motion for judgment on the pleadings.  Plaintiff asserts the following points: 1) the ALJ erroneously concluded that J.J.J. does not meet the listing for ADHD; 2) alternatively, the ALJ erred by failing to find that J.J.J.'s symptoms are not functionally equal to the listing.  With regard to these points, Plaintiff contends that the ALJ ignored the bulk of the evidence while "cherry picking" other evidence that supported his conclusion, inappropriately adopted the opinion of Chandrasekhar, who testified at the hearing without having reviewed the entire record, failed to appropriately weigh the medical evidence and, in particular, failed to give controlling weight to the opinions of treating physician Dr. Brown, M.D. and treating psychiatrist Dr. Oyegbile. Plaintiff contends that the matter should be remanded solely for the calculation of benefits, or, in the alternative, remanded for a new hearing.

Thereafter, the Court granted Defendant two extensions of time in which to file a

response, and on July 30, 2014, Defendant filed her cross-motion for judgment on the pleadings.  Defendant admits that the ALJ primarily relied upon the opinions of Hochberg and Chandrasekhar.  *See*, Def. Memo of Law [#15] at p. 19 ("[T]he ALJ appropriately gave great weight to Drs. Hochberg and Chandrasekhar.").  In fact, in the argument section of Defendant's brief, Hochberg's opinion is referenced nine times and Chandrasekhar's testimony is referenced eight times.  However, Defendant contends that it was proper for the ALJ to rely so heavily on the opinions of Hochberg and Chandrasekhar, while giving little or no weight to the opinions of J.J.J.'s treating doctors and psychologists.

On August 11, 2014, Plaintiff filed a reply in which she contends, for example, that Hochberg's opinion was rendered "prior to the submission of the majority of relevant medical  and educational evidence," and that Chandrasekhar's opinion was similarly based upon an "incomplete review of the record."

DISCUSSION

*Dr. Chandrasekhar's Testimony*

Chandrasekhar testified that she formed her opinion after reviewing all of the medical/school exhibits, except for the two exhibits that Plaintiff submitted after the hearing. (Exs. 16F-17F).  Those two exhibits were, respectively, the report from J.J.J.'s fourth-grade teacher (606-609) and the report from Bonney that was co-signed by Dr. Oyebile (610-613), both of which indicated that J.J.J. had "marked," "severe" and even "extreme" limitations in certain domains.  Nevertheless, without having seen those reports, Chandrasekhar opined that J.J.J. had "less than marked" limitations in the domains of "attending [*sic*, should have been "acquiring"] and using information,"

20

"attending and completing tasks" and "health and physical well being," and "no limitation" with regard to the domains of "moving about and manipulating objects" and "caring for self." (64).  Chandrasekhar further testified that she believed J.J.J. had a marked limitation with regard to "interacting and relating with others" up until January 13, 2011, but that subsequently J.J.J. did not have such a limitation because his behavior at school improved. (64-65).  More specifically, Chandrasekhar opined that on January 13, 2011, J.J.J.'s "medication was adjusted and altered," which resulted in "good improvement according to the teacher's questionnaire and the school report, and [Exhibit] 14F." (65).   On that point, Chandrasekhar indicated that she did not "have any information about any suspensions" from school after January 13, 2011, even though she had reviewed all of Exhibit 14F. (65).

As previously noted, the ALJ relied heavily on Chandrasekhar's testimony in finding that J.J.J. is not disabled.  However, it should have been apparent to the ALJ that Chandrasekhar's recollection of the school records was inaccurate.  That is, Chandrasekhar was under the mistaken impression that J.J.J.'s behavior at school improved drastically from January 13, 2011 onward, when in fact Exhibit 14F indicates the opposite.  More specifically, and as detailed earlier, Exhibit 14F details the many incidents, during the remainder of the 2010-2011 school year and into the following school year, when J.J.J. was disciplined for misbehavior at school, most of which involved violent conduct.  To begin with, on January 13, 2011, the day which Chandrasekhar identified as having been the day that J.J.J.'s behavior improved, not only was J.J.J. already on suspension, but he was further disciplined for screaming at, and attempting to physically assault, an adult staff member. (508).  Later that same

21

day, J.J.J. threatened and verbally abused a classmate. (509).  Continuing on, between

February 2011 and November 2011, J.J.J. was written up on at least thirteen additional

occasions, mostly for acts of violence against other children, as well as for possessing a

knife on multiple occasions.  The records detailing these incidents also specifically refer

to the fact that J.J.J. was placed in suspension on five occasions after January 13,

2011.

Chandrasekhar's testimony that J.J.J.'s medication was successfully "adjusted

and altered" in January 2011, and that such improvement continued, is also not

supported by the record. (65-66).  For example, on March 17, 2011, Plaintiff and Dr.

Brown discussed the fact that J.J.J.'s medication (Concerta) was not working, and that

the child was getting into trouble at school. (359).  Similarly, on on August 31, 2011,

Kleckner reported that J.J.J.'s medication  was "no longer effective." (331).  Then, on

October 11, 2011, Kleckner switched J.J.J.'s medication again, because J.J.J. had

"been in trouble at school daily." (342).

During the hearing, Plaintiff's attorney pointed out the inconsistencies between

the record and Chandrasekhar's testimony, and moved to strike Chandrasekhar's

testimony.  However, the ALJ denied that request, and instead, placed heavy reliance

on Chandrasekhar's testimony.  The ALJ's reliance on the testimony of a non-

examining medical expert who did not have the entire medical record, and whose

testimony was inconsistent with the records that she did have, was error. *See, Roman*

*v. Astrue*, No. 10–CV–3085 (SLT), 2012 WL 4566128 at *5, 15-17 (E.D.N.Y. Sep. 28,

2012) (It was error for ALJ to give "significant weight" to opinion of non-examining SSA

physician who "misread the record," while giving little or no weight to the claimant's

treating physicians)

_Hochberg's Report_

Apart from Chandrasekhar's testimony, the ALJ relied most-heavily on the report by Hochberg, the Commissioner's non-treating non-examining review psychologist. However, Hochberg completed his report on January 14, 2011, sixteen months prior to the administrative hearing, and therefore he did not have access to all of the subsequent records spanning into 2012.  In fact, Hochberg saw only about half of the record that is before the Court, and it was the better half in terms of J.J.J.'s behavior. Consequently, it is not surprising that Hochberg's report, like Chandrasekhar's testimony, also fails to accurately characterize the record before the Court.[4]

For example, Hochberg indicated that J.J.J. had a "less than marked" limitation in "attending and completing tasks," based upon Hochberg's review of an office note by Dr. Brown, dated October 5, 2010, indicating that J.J.J.'s behavior at school had been better recently. (313, 431).  However, that office note is clearly not representative of J.J.J.'s behavior at school during the 2010-2011 or 2011-2012 school years.  Similarly, Hochberg found that J.J.J. had a "less than marked" limitation in "interacting and relating with others," purportedly because J.J.J. was "defiant and easily agitated at home" but "d[id] better at school" (313), which is also belied by the record as a whole.

In fact, Hochberg's report did not even accurately represent the state of facts at the time it was written, since Hochberg apparently did not have the school/medical

---

[4]Hochberg's opinion was not even consistent with Chandrasekhar's.  For example, Chandrasekhar opined that J.J.J. had "less than marked" limitations in the domains of "acquiring and using information" and "health and physical well-being," but Hochberg indicated that J.J.J. had "no limitations" at all in those domains. (64, 313-314).

records from November 2010, December 2010, or early January 2011, when J.J.J.'s behavior at school was rapidly deteriorating. (508-509, 552, 554, 556-557). Presumably, if Hochberg had been able to see the entire record, his opinion would have been different.

In sum, Hochberg's report was based on an incomplete record and was not well-supported by the entire record, and therefore does not constitute substantial evidence in support of the ALJ's determination.  Consequently, the ALJ's heavy reliance on Hochberg's opinion was erroneous. *See, Hidalgo v. Bowen*, 822 F.2d 294, 296, 298 (2d Cir. 1987) (It was error for ALJ to rely on opinion of non-treating agency review physician who "did not have before him the complete medical records of the claimant," where the missing records may have altered his opinion, and where the agency physician's opinion was contradicted by multiple treating physicians).

*Dr. Brown's Opinions*

The ALJ devoted only a short paragraph in his decision to J.J.J.'s primary treating physician, Dr. Brown. (80).  In that regard, the ALJ did not refer to any of Brown's office notes, but only to the report that Brown completed on April 24, 2012. The ALJ noted that according to Brown, J.J.J. had, *inter alia*, marked limitations in two domains, "attending and completing tasks" and "interacting and relating to others." (80). In other words, Brown's report, if accepted, establishes disability.

 However, the ALJ chose to give only "little weight" to Brown's opinion as to the two aforementioned domains, while accepting her opinion as to the four other domains in which she did not find marked limitations. (80).  The reason that the ALJ gave was as follows:  "The undersigned gives little weight to this examiner's opinion as the claimant

24

was last seen by this clinician on October 24, 2011, and there has been medication changes since that time which have affected the domains that were classified as marked." (80).  The Court observes, though, that, as already discussed, Hochberg's opinion was based on information dating from October *2010*, a year earlier than the last time that Brown saw J.J.J., and the ALJ nevertheless gave substantial weight to that stale opinion.  Accordingly, the ALJ was not consistent in his approach to weighing the medical opinions.  Moreover, the suggestion that J.J.J.'s behavior improved after October 2011 due to medication changes is belied by the record, as already discussed. Overall, the ALJ failed to properly discuss or weigh Brown's medical evidence and opinions as required by the treating physician rule.

### *Bonney's and Oyegbile's Opinions*

It was similarly erroneous for the ALJ to disregard the opinions of Bonney and Oyegbile.  In that regard, the ALJ gave no weight to one of Bonney's reports, and only "little weight" to another one of her opinions that was co-signed by Dr. Oyegbile.  In both instances, the ALJ indicated that the reports were essentially worthless since "clinical social workers are no [sic] acceptable medical sources." (79).  However, even assuming that the ALJ was correct about Bonney's opinion, he erred by discounting the report co-signed by Oyegbile. *See, e.g., Lewis v. Colvin*, No. 12-cv-01317 (WGY), 2014 WL 6687484 at *4-5 (N.D.N.Y. Nov. 25, 2014) (collecting cases in which ALJs erred by failing to properly evaluate reports that were co-signed by doctors).  In any event, the ALJ was also mistaken insofar as he indicated that the opinion of an LCSW is entitled to no weight in determining the severity of a claimant's condition. *See*, SSR 06-03p, 71

FR 45593-03, 2006 WL 2263437 ("In addition to evidence from 'acceptable medical sources,' we may use evidence from 'other sources,' as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to: • Medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, *licensed clinical social workers*, naturopaths, chiropractors, audiologists, and therapists;") (emphasis added).[5]  While it is true that the opinion of an LCSW cannot establish *the existence* of a medically determinable impairment, here the ALJ does not dispute that J.J.J. in fact has ADHD. (77).  Accordingly, it was error for the ALJ to disregard Bonney's opinions as to *the severity* of J.J.J.'s condition simply because she is not an "acceptable medical source."

The ALJ also purportedly declined to give much weight to the report of Bonney and Oyegbile because "there were no definitions for the levels indicated and no explanation of how these limitations relate to the claimant." (79).  The Court does not believe that the report is unclear, but to the extent that the ALJ disagrees he should have developed the record by seeking clarification rather than rejecting the report.

<u>*Report by J.J.J.'s Teacher*</u>

Reports by school teachers are also entitled to consideration regarding the severity of a child's condition. *See*, SSR 06-03p, 71 FR 45593-03, 2006 WL 2263437 (Indicating that information from "non-medical sources" such as "school teachers" "may provide insight into the severity of the impairment(s) and how it affects the individual's

---

[5]The ALJ committed this error event though he purportedly considered the record evidence in accordance with SSR 06-03p. (78).

ability to function.").  Here, however, the ALJ declined to give any weight to the opinion of J.J.J.'s teacher (Exhibit 16F) because "it was not signed" and because "there are no definitions for the levels indicated and no explanation of how they relates [sic] to the claimant." (79).  As the Court already explained, it appears that Exhibit 16F was not signed because the signature line indicated that it was for the signature of a medical doctor. (609).  Obviously, Plaintiff's counsel should have addressed that problem prior to the hearing, but nevertheless the ALJ should have developed the record further before rejecting the highly-probative report.  Similarly, to the extent that the ALJ claims that the report had insufficient "definitions for the levels," he should have developed the record.

CONCLUSION

Plaintiff's application [#10] is granted, defendant's application [#15] is denied, and this matter is remanded to the Commissioner for further administrative proceedings, pursuant to 42 U.S.C. § 405(g), sentence four.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
        April 27, 2015

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge